# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**JACOB LEE ROSE, as Guardian of**
**Person for SHANE RADOMSKI**
**7946 Lansdale Road**
**Baltimore, Maryland 21224**

    *Plaintiff*

    v.

**BALTIMORE COUNTY,**
**MARYLAND**
Serve:
    James R. Benjamin, Jr., Esq.
    County Attorney
    Historic Courthouse
    400 Washington Avenue
    Towson, MD 21204

    and

**OFFICER G. DEPEW #05092**
*Individually and in his Official Capacity*
*as a Baltimore County Police Officer*
6424 Windsor Mill Road
Gwynn Oak, MD 21207

**OFFICER R. JOHNSON #05271**
*Individually and in his Official Capacity*
*as a Baltimore County Police Officer*
6424 Windsor Mill Road
Gwynn Oak, MD 21207

    and

**OFFICER B. LANGE #05243**
*Individually and in his Official Capacity*
*as a Baltimore County Police Officer*
6424 Windsor Mill Road
Gwynn Oak, MD 21207

Case No._____

Jury Trial Demanded

and

**OFFICER J. TRENARY #05232**
*Individually and in his Official Capacity*
*as a Baltimore County Police Officer*
6424 Windsor Mill Road
Gwynn Oak, MD 21207

     *Defendants.*

<u>**COMPLAINT AND JURY DEMAND**</u>

Plaintiff, Jacob Lee Rose, as Guardian of Person for Shane Radomski, through counsel, sues Defendants Baltimore County, Officer G. Depew in his individual capacity, Officer R. Johnson in his individual capacity, Officer B. Lange in his individual capacity, and Officer J. Trenary in his individual capacity.

<u>**INTRODUCTION**</u>

*The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.*

    -- Justice Byron White, Tenn. v. Garner, 471 U.S. 1, 11 (1985).

19-year-old Shane Radomski was not a violent criminal, and not a suspect of any kind. He was in the wrong place at the wrong time, coincidentally in a parking lot where a "special unit" of Baltimore County Police Officers were attempting to arrest another individual. When the plain-clothed officers, clad in tactical gear and driving unmarked

vehicles, stormed the parking lot with guns drawn, Shane, quite reasonably, panicked. As he tried to drive away, another unmarked police vehicle collided with Shane at low speed. Rather than identify who was in the car, or pursue him, the Individual Defendant Officers gunned him down, shooting indiscriminately into the car until Shane, riddled with more than ten gunshot wounds, including to his head, drifted to a stop.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331, 42 U.S.C. §1983, 1988; and supplemental jurisdiction over state-law claims under 28 U.S.C. §1367.

2.     Venue is proper in this Court under 28 U.S.C. § 1391 because the parties are domiciled in Maryland or organized under Maryland law, and the events took place in Baltimore County, Maryland.

3.     Plaintiff timely filed notice of its claims under the Local Government Tort Claims Act, §5-301 *et seq*. of the Courts and Judicial Proceedings Article.

## PARTIES

4.     Shane Radomski was, at all times relevant, an adult resident of Maryland.

5.     Mr. Radomski, as a consequence of the acts described herein, has been permanently disabled, both physically and mentally.

6.     On November 7, 2022, by court order, Plaintiff Jacob Lee Rose was appointed legal guardian of Mr. Radomski's person.

7.     Defendant Baltimore County, Maryland is a municipal corporation organized under the provisions of Art. XI-A of the Maryland Constitution. At all times

mentioned, Baltimore County employed the individual Defendants, Officer Depew, Officer Johnson, Officer Lange, and Officer Trenary.

8.     Defendant Officer G. Depew Badge #05092, was, at all times relevant, employed by the Baltimore County Police Department as a Police Officer, and was acting in his individual capacity and/or in his official capacity as a Baltimore County Police Officer, and was acting under the authority and color of state law.

9.     Defendant Officer R. Johnson Badge #05271, was, at all times relevant, employed by the Baltimore County Police Department as a Police Officer, and was acting in his individual capacity and/or in his official capacity as a Baltimore County Police Officer, and was acting under the authority and color of state law.

10.     Defendant Officer B. Lange Badge #05243, was, at all times relevant, employed by the Baltimore County Police Department as Police Officer, and was acting in his individual capacity and/or in his official capacity as a Baltimore County Police Officer, and was acting under the authority and color of state law.

11.     Defendant Officer J. Trenary Badge #05232, was, at all times relevant, employed by the Baltimore County Police Department as Police Officer, and was acting in his individual capacity and/or in his official capacity as a Baltimore County Police Officer, and was acting under the authority and color of state law.

12.     Officers Depew, Johnson, Lange, and Trenary are herein referred to as the Individual Defendants.

13.     On information and belief, the Individual Defendant Officers were all members of BCPD's Criminal Apprehension Support Team.

## FACTS COMMON TO ALL COUNTS

14.     Shane Radomski, a 19-year-old recent graduate of Dundalk High School, was in the wrong place at the wrong time. Now, because of the grossly excessive deadly force employed by Defendants, he is permanently disabled, with little hope of regaining and normal and meaningful function.

15.     On April 14, 2022, Baltimore County Police (BCPD) were attempting to serve an arrest warrant on Brian Rodriguez for his alleged involvement in a 2021 murder.

16.     Presumably, because they had intelligence regarding Mr. Rodriguez' whereabouts on April 14th, BCPD attempted to serve the warrant in the parking lot of a body shop at Avon Road and Maryland Avenue in Dundalk, Maryland.

17.     At approximately 12:40 pm, three cars pulled into a parking lot at the above intersection. Two four-door sedans, one occupied by Mr. Rodriguez and another man, and one (a Nissan) driven by Mr. Radomski, parked next to one another in an unpaved section of the parking lot. A third car, a white two-door sports car, parked in a spot opposite the two sedans.

18.     Moments after Mr. Rodriguez exited his vehicle, at least four unmarked non-descript vehicles rushed in, with at least one using a siren, but none using lights. All the non-descript vehicles had darkly tinted windows.



***Figure 1:*** *Mr. Radomski is in the vehicle marked with a yellow arrow. The BCPD vehicles are marked with blue arrows. On information and belief, the subject(s) of the police action are standing in front of Mr. Radomski's vehicle.*

19.     As the officers, wearing only plain clothes with tactical vests (and not uniforms) jumped out, guns drawn, shouting at Mr. Rodriquez, Mr. Radomski apparently panicked, and tried to drive away.

20.     As he drove toward an open area of egress, another non-descript police vehicle, a large SUV driven by one of the Defendant Officers[1], entered oncoming lane of traffic where Mr. Radomski had the right of way, and caused a collision. This incidental collision at low speed barely registered on the much larger SUV.

---

[1] To date, Baltimore County has refused to produce its investigatory file in this incident, despite the apparent closure of any criminal investigation into the officers.



**Figure 2:** *Mr. Radomski and one of the Defendant Officers driving the SUV collided. Mr. Radomski was on the right side of the road and could not have foreseen that an unmarked BCPD SUV would have entered oncoming traffic so suddenly.*

21.     Baltimore County Police policy required the Defendant Officers to operate their vehicles in compliance with all laws and regulations, even during emergency operation.

22.     The Defendant Officer driving the SUV caused the collision by driving aggressively into an oncoming lane of traffic, violating numerous laws and regulations, and causing the collision.

23.     Mr. Radomski slowly reversed his car, attempting again to navigate toward a clear area of egress, this time around the SUV.



**Figure 3:** *As Mr. Radomski reversed his vehicle away from the BCPD SUV, each of the four Defendant Officers, marked with blue arrows, was in a position of physical safety.*

24.     Each of the Defendant Officers was easily able to move to a position of safety.

25.     Mr. Radomski then shifted into forward drive and moved slowly toward an open area of egress, yet the Defendant Officer, despite not being in any imminent danger, fired a "kill shot" through the windshield.



**Figure 4:** *As Mr. Radomski moved toward an open lane, away from the Defendant Officers, one of the Defendant Officers fired a deadly shot at the then-unknown driver (bullet entry marked by the red circle).*

26.     The Baltimore County Police policy on vehicle pursuits precludes the mere initiation of a vehicle pursuit where the offense is a traffic violation, and the risks exceed the seriousness of the offense.

27.     Far beyond pursuing Mr. Randomski, the Defendant Officer driving the SUV, rather than stay in a position of safety, *chased* after Mr. Radomski's car, firing round after round into the vehicle's cabin.





**Figures 5 & 6:** *As Mr. Radomski drove away from the Defendant Officers, the BCPD Officer that exited the SUV chased after Mr. Radomski (movement marked in blue), continuing to shoot into the vehicle cabin.*

28.     As this happened, the other Defendant Officers joined the shooting spree, firing dozens of bullets at Mr. Radomski's car until it drifted to a stop.

29.     The Defendant Officers knew that the person in the Nissan was not the target of their warrant, but they took no steps to identify the driver, or potentially the passengers, before opening fire.

30.     And this took place in the middle of the day in front of a local garage likely filled with employees and customers.

31.     The Defendant Officers intentionally and callously fired dozens of bullets at an unidentified vehicle that was driving *away* from them. They chased after the vehicle, continuing to fire round after round, any one of which could have maimed or killed not only the occupants of the vehicle but the civilian bystanders the Defendant Officers are sworn to protect.

32.     Baltimore County's Use of Force Policy provides that officers can only discharge their weapon at a moving vehicle when that vehicle is "being used against the officer" and the "safety of innocent persons would not be jeopardized." Neither of those conditions precedent was fulfilled here.

33.     All the Defendant Officers were easily able to maintain a position of safety while the driver of the Nissan attempted to escape the scene.

34.     Far from protecting themselves and bystanders, the Defendant Officers indiscriminately fired at the vehicle from multiple angles, risking crossfire that could have injured other officers and bystanders.

35.    Even if the Defendant Officers perceived danger from the initial collision, they did not begin shooting until it was patently obvious that the unknown driver was attempting to *leave* the scene, not use his car "against" the Defendant Officers.

36.    If the Defendant Officers suspected Mr. Radomski of any crime, they could have simply pursued him like any other suspect. Instead, the Defendant Officers applied deadly force by discharging their handguns at him dozens of times, striking Mr. Radomski about 12 times in his wrists, shoulders, back, arms, and head.

37.    And but for the fortunate placement of surveillance cameras by a nearby business, no video evidence of this tragic encounter would exist. Because, despite Baltimore County's stated goal of equipping all officers with body cameras, not a single officer involved in Mr. Radomski's shooting was wearing a camera.

38.    It is well-documented that "special" police units, like the Criminal Apprehension Support Team involved in this case, "almost always" lead to "big time problems and quite often tragedies."[2]

39.    Over a period of decades, such specialized units have come to power in Detroit, Los Angeles, Memphis, New York City, and even in Baltimore. In each case, the units engaged in rampant violation of constitutional rights, and caused hundreds of

---

[2] In the wake of the Tyre Nichols case, PBS reported on the long history and failures of these units. Kenichi Serino, *Police Special Units Like the One that Killed Tyre Nichols Are Common. Here's Why They've Drawn Criticism*. February 3, 2023. https://www.pbs.org/newshour/nation/police-special-units-like-the-one-that-killed-tyre-nichols-are-common-heres-why-theyve-drawn-criticism.

overturned convictions along with untold civil monetary damages.

40.     With knowledge of that history, Baltimore County empowered the members of the Criminal Apprehension Support Team by equipping them with tactical gear and excluding them from the BCPD's otherwise extensive dashboard and body-worn camera programs.

41.     Baltimore County's Body Worn Camera policy requires that the cameras be activated during pursuits, arrests, field interviews, traffic stops, execution of all warrants, emergency vehicle operations, and any "other activities of a potentially confrontational nature."

42.     By its title and scope, the Criminal Apprehension Support Team, tasked with arresting violent offenders wanted in the county and surrounding areas, is likely to be engaged in these activities more often than almost any other disparate group within BCPD.

43.     Yet, seven years after BCPD began implementing the Body Worn Camera Program, not a single member of the Criminal Apprehension Support Team wears one.

44.     On another recent occasion, Detective Trenary, one of the Defendant Officers, shot another driver after the driver allegedly struck Trenary's vehicle during attempted service of a warrant. Again, he was not wearing a body camera or using a dashboard camera.

45.     BCPD has made a conscious choice to let certain units or officers, including the members of the Criminal Apprehension Support Team, operate without fear that video evidence of their unconstitutional conduct will surface after an incident.

46.     The Chief of Police for Baltimore County has, at all times, retained discretion of which units within BCPD are outfitted with body worn cameras and vehicle dashboard cameras.

47.     As a result of the gunshot wounds inflicted by the Defendant Officers, Mr. Radomski suffered acute respiratory failure, hypoxia, pneumonia, pleural effusion, acute DVT, traumatic brain injury, seizures, among other severe mental and physical injuries causing substantial economic and non-economic damages.

48.     At all times, Defendants acted with actual or implied malice, intentionally, grossly negligently, and/or negligently.

49.     Exacerbating the BCPD's malicious conduct, there was exculpatory evidence clearing Brian Rodriquez of any suspicion for the underlying murder.

50.     Had Baltimore County Police exercised reasonable diligence before executing this SWAT-like operation, Mr. Radomski would not have suffered these life-altering injuries.

51.     At all times, Defendants acted without legal justification or excuse.

52.     At all times, Defendants acted under color and pretense of law, and under color of statute, customs, and usages of the State of Maryland.

53.     At all times, Defendants acted within the scope of their employment with Baltimore County.

### COUNT I
*Common Law Battery*
**(vs. Depew, Johnson, Lange, and Trenary)**

54.     The preceding paragraphs are incorporated herein.

13

55.     The Individual Defendant Officers, individually and collectively, discharged their handguns in the direction of Mr. Radomski without legal justification or excuse.

56.     The bullets fired by the Individual Defendant Officers struck Mr. Radomski at least six times.

57.     As a direct and proximate result of Individual Defendants' battery, Mr. Radomski suffered severe physical and mental injuries that will require comprehensive medical care for the remainder of his life.

58.     At all relevant times, the Individual Defendants were acting in their official capacities as police officers employed by Baltimore County.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT II
### 42 U.S.C. § 1983 Excessive Force
### (vs. Depew, Johnson, Lange, and Trenary)

59.     The preceding paragraphs are incorporated herein.

60.     At all relevant times, the Individual Defendants were state actors and "persons" within the meaning of 42 U.S.C. § 1983 and were acting within the scope of their employment in the Baltimore County Police Department.

61.     Officers Depew, Johnson, Lange, and Trenary, deprived Mr. Radomski of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution, namely the right to be free from summary punishment and excessive and unreasonable force.

62.     The Individual Defendant Officers, acting with actual or implied malice, deliberately deprived Mr. Radomski of these clearly established rights when they fired more than forty bullets into Mr. Radomski's car in absence of any reasonably perceived danger of imminent death or bodily harm.

63.     Mr. Radomski's right to be free from the use of deadly force is well established and known by all Baltimore County Police Officers, including the Individual Defendants.

64.     The Baltimore County Police Field Manual prohibits the use of deadly force except when officers reasonably fear imminent death or serious injury to themselves or innocent bystanders.

65.     Mr. Radomski, although incidentally colliding with an unmarked police SUV, was clearly attempting to drive *away* from the Defendant Officers.

66.     Faced with a choice between 1) letting an unknown person drive away from the scene of an arrest; and (2) firing dozens of rounds from various angles at an unidentified vehicle in the middle of the day by a busy store front, the Defendant Officers chose the latter.

67.     Each of the Officers was easily able to maintain a position of physical safety during the encounter.

68.     This is not a mere attempt to substitute hindsight for the Defendant Officers' "heat of the moment" judgment.

69.     Allowing Mr. Radomski to drive away posed almost no danger to anyone. Firing round after round at the vehicle's cabin was certain to cause death or serious injury to the driver, any potential occupants, bystanders, and other officers.

70.     Instead, the Defendant Officers shot to kill, summarily sentencing Mr. Radomski to almost certain death for colliding with an unmarked police car and attempting to leave the scene.

71.     A minor hit and run without injury does not justify either a pursuit or the use of deadly force.

72.     The Defendant Officers acted with deliberate indifference toward Mr. Radomski, and with reckless disregard for Mr. Radomski's constitutionally protected right to be free from summary punishment and excessive and unreasonable force.

73.     The Individual Defendant Officers' use of force in seizing Mr. Radomski was objectively unreasonable in light of the circumstances confronting them at the time.

74.     As a direct and proximate result of Individual Defendants' deliberate indifference, Mr. Radomski suffered severe physical and mental injuries that will require comprehensive medical care for the remainder of his life.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and

post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT III
### *42 U.S.C. § 1983 Excessive Force – MONELL*
**(vs. Baltimore County)**

75.     The preceding paragraphs are incorporated herein.

76.     Baltimore County failed to properly train, supervise, and discipline its officers against the use of excessive force, including unjustified deadly force.

77.     The failure to properly train, supervise, and discipline officers demonstrates gross disregard for the constitutional rights of the public, including Mr. Radomski, and was a proximate cause of Mr. Radomski's injuries.

78.     Baltimore County has also instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights.

79.     The use of excessive force occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore County. This is a result of Baltimore County's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that excessive force will not be used and to ensure that allegations of excessive force will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of excessive force, failure to provide adequate medical care, cover-up, and failure to investigate. This pattern and practice has been manifested in other prior incidents involving county officers.

a.  On or about December 19, 2015, Zachary Blumstein became involved in a verbal altercation outside of the Green Turtle Restaurant in Towson, MD. A man who did not identify himself as a police officer grabbed Mr. Blumstein by the arm and pepper sprayed him in the face. Two other officers held Mr. Blumstein down and one of the officers punched him in the face at least once with a closed fist.

b.  On or about August 1, 2016, Baltimore County Police attempted to serve a bench warrant on Korryn Gaines. Ms. Gaines had a shotgun in the home. Six officers gave statements saying that they were not in Ms. Gaines' line of fire and never felt threatened. She was shot by a Baltimore County officer and her son suffered minor physical injuries.

c.  In September 2016, Tawon Boyd, 21 years old, called 911 for assistance during a mental health crisis. Baltimore County police officers responded with the EMTs and, during the attempted restraint, severely beat Mr. Boyd, contributing to his death three days later.

d.  On or about February 9, 2019, Thomas Allotey, his then-girlfriend, and her three young children, moved into their new home. An unknowing neighbor reported a potential break-in at the residence. Despite all evidence to the contrary, officers forcibly entered the home, physically restrained the adults, then, in front of the young children, sprayed pepper spray in Mr. Allotey's face, threw him to the ground, and repeatedly punched him in the head. To conceal their unlawful conduct,

the officers referred the victim for serious criminal charges.

e.   On or about March 15, 2019, civilian cell phone video shows Officer Becketts assisting in the arrest of a young Black male with at least three other officers. As the officers are attempting to place the man under arrest, Officer Becketts can be seen punching the man in the head area at least once and kicking him in the head at least once before another officer pushes him away and tells him to "Back up!"

f.   On or about November 26, 2019, Baltimore County Officers received a call from a mother who was concerned about her son, Eric Sopp. He was experiencing a mental health crisis and had left the home after drinking and was suicidal. Officers conducted a traffic stop on the unarmed man and ultimately, he was fatally shot on the side of I-83.

g.   On or about January 29, 2020, Baltimore County officers were dispatched to a residential location following a report of property damage and a possible break-in. The responding officer, Cpl. Brennan's conversation with the woman could be described as antagonistic and the woman ceased all communication with the officer. The officer followed the woman to her grandmother's house to arrest her for disorderly conduct. He then deployed his mace and taser into the home before saying "You are so f*cked up now! Jesus f*cking Christ!" Officer Schmidt then ran up and immediately tackled the 76-year-old grandmother to the ground.

80.     Baltimore County has failed to keep accurate records as to the number of false arrests by members of its police force. This policy encourages arrests without probable cause and inhibits Baltimore County from critically evaluating the need for a change in training.

81.     Baltimore County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of excessive force by officers who have a pattern or history of such behavior.

82.     Baltimore County has also empowered its officers, specifically the Individual Defendants and others in special units, including the Criminal Apprehension Support Team to freely violate the constitutionally protected rights of citizens by failing to equip them with body cameras.

83.     Specifically, after the Gaines and Boyd incidents in 2016, *supra*, then Baltimore County Executive Kevin Kamenetz and BCPD stated their intent to equip BCPD officers with body worn cameras by September 2017, fourteen months earlier than previously planned.

84.     According to Mr. Kamenetz, body worn cameras "make our community and our officers safer."[3]

---

[3] Ethan McLoud, *Balt. Co. Police to Speed Up Body Cam Rollout, Improve Sex Assault Response and Training Policies*, BALTIMORE FISHBOWL (Oct. 19, 2016), https://baltimorefishbowl.com/stories/balt-co-police-speed-body-cam-rollout-improve-sex-assault-response-training-policies/.

85.     Despite Baltimore County's stated goal of equipping all officers with body cameras, not a single officer involved in Mr. Radomski's shooting was wearing a camera.

86.     In August 2022, Baltimore County Police estimated that 350 sworn officers still lacked body worn cameras.

87.     After Defendant Trenary shot another civilian in 2023, again without a body worn camera or dashboard camera on his vehicle, Baltimore County Police estimated that there were still about 350 sworn officers without body worn cameras.

88.     At all times, the Chief of Police for Baltimore County, Melissa Hyatt from 2019 to November 2022, had complete discretion over which officers or units were incorporated into the BCPD body worn camera program.

89.     Baltimore County, through its Chief of Police, established a policy that certain officers, including the Individual Defendants, would be excluded from the body worn camera program even though they engage in a disproportionate amount of police activity that otherwise requires activation of a body worn camera.

90.     By creating a "special unit" like the Criminal Apprehension Support Team, with actual knowledge that these units are more likely to commit serious violations of the constitutional rights of civilians, and reducing officer accountability through an official policy of excluding these officers from the body worn camera program, Baltimore County made it reasonably likely that injuries such as those inflicted upon Mr. Radomski, would occur with regularity.

91.     This intentional failure to ensure even a marginal level of accountability is evidence that Baltimore County intended for special units like the Criminal Apprehension

Support Team to act with impunity.

92.     Further, the failure to train Baltimore County Officers in the appropriate use of deadly force is so patently obvious from the conduct of the Individual Defendant Officers that constitutional violations would be the expected result.

93.     Baltimore County also fails to act in reporting these incidents of reckless conduct to any supervising authority, and or the citizens of Baltimore County. The County lacks an effective internal affairs procedure and has no meaningful system to control or monitor its officers and employees who have a pattern or history of unlawful behavior.

94.     In 2021, the Maryland Legislature created the Independent Investigations Division within the Office of the Maryland Attorney General.

95.     Beginning in October 2021, Baltimore County, like all other Maryland jurisdictions, was required to report incidents where police killed a civilian, or where the injuries inflicted were *likely to result in death*, for independent investigation.

96.     Despite the grievous injuries inflicted on Mr. Radomski, on information and belief, Baltimore County did not report this shooting to the Office of the Attorney General, further shielding the Individual Defendants from accountability.

97.     As a direct and foreseeable result of the aforementioned policies, Baltimore County Police Officers regularly deprive citizens of their constitutionally protected rights, including to be free from summary punishment and excessive force.

98.      Baltimore County knew, or should have known, that the execution of these customs or policies would cause severe injuries to citizens, including Mr. Radomski.

99.     Baltimore County's permissive, if not encouraging, policy toward the use of unreasonable and excessive force caused the deprivation of Mr. Radomski's Fourth and Fourteenth Amendment rights when he was summarily shot about twelve times by the Individual Defendants.

100.    But for the fortunate placement of privately-owned surveillance cameras, the public, including Mr. Radomski's family, would have never known the truth behind his severe, life-altering injuries.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT IV
### *Article 24 & 26 Maryland Declaration of Rights – Excessive Force*
**(vs. All Defendants)**

101.    The preceding paragraphs are incorporated herein.

102.    At all relevant times, the Individual Defendants acted under color of the laws of the State of Maryland.

103.    The Individual Defendants used objectively unreasonable, unnecessary and excessive force against Mr. Radomski, thereby injuring him and violating his right to be free from excessive force, as protected by Articles 24 and 26 of the Maryland Declaration of Rights.

104.   No force, especially not deadly force, was authorized based on the circumstances confronting the Individual Defendants at the time.

105.   The Individual Defendants acted deliberately, without provocation or legal justification, and with intent to violate Mr. Radomski's rights under Articles 24 and 26 of the Maryland Declaration of Rights.

106.   As a direct and proximate result of the Individual Defendants' deliberately indifferent conduct, Mr. Radomski suffered permanent and catastrophic physical injury.

107.   In the foregoing acts, the Individual Defendants were acting within the scope of their employment with Baltimore County.

108.   Baltimore County is vicariously liable for the Individual Defendants' violations of Mr. Radomski's rights under Articles 24 & 26 of the Maryland Declaration of Rights.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT V
### Article 24 & 26 Maryland Declaration
### of Rights – Excessive Force (Longtin Claim)
### (vs. Baltimore County)

109.   The preceding paragraphs are incorporated herein.

110.   Baltimore County failed to properly train, supervise, and discipline its officers against the use of excessive force, including unjustified deadly force.

111.   The failure to properly train, supervise, and discipline officers demonstrates gross disregard for the constitutional rights of the public, including Mr. Radomski, and was a proximate cause of Mr. Radomski's injuries.

112.   Baltimore County has also instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights.

113.   The use of excessive force occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore County. This is a result of Baltimore County's failure to establish effective procedures, rules, orders, guidelines, and practices to ensure that excessive force will not be used and to ensure that allegations of excessive force will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of excessive force, failure to provide adequate medical care, cover-up, and failure to investigate. This pattern and practice has been manifested in other prior incidents involving county officers, as set forth in Plaintiffs' *Monell* Count.

114.   Baltimore County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of excessive force by officers who have a pattern or history of such behavior.

115.   As previously stated, Baltimore County's failure to implement a body worn camera program for a "special unit" like the Criminal Apprehension Support Team,

despite knowledge that these units have historically resulted in gross violations of civilians' constitutional rights, and its failure to adequately discipline officers for these incidents or report them for independent investigations, has created a custom or policy of tolerance for excessive force against civilians.

116.   Baltimore County's failure to properly train, prosecute, supervise, and discipline its officers is so patently obvious from the conduct of the Individual Defendants Officers that constitutional violations would be the expected result.

117.   Baltimore County caused its officers and other employees to believe that their use of excessive force would not be aggressively, honestly, and properly investigated.

118.   Baltimore County should have foreseen that such a policy would promote the use of illegal, unconstitutional, and excessive force, where such force is objectively unreasonable.

119.   The execution of the unconstitutional policies or customs of Baltimore County was the cause of Mr. Radomski's injuries.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT VI
### Common Law Gross Negligence
### (vs. Depew, Johnson, Lange, and Trenary)

120.    The preceding paragraphs are incorporated herein.

121.    The Individual Defendants owed a duty to Mr. Radomski to refrain from the use of deadly force absent reasonable belief that the officers present, or innocent bystanders, were in imminent danger of severe injuries.

122.    The Individual Defendants breached this duty when they fired forty bullets into Mr. Radomski's car in the absence of any real danger to the officers or anyone else.

123.    Mr. Radomski attempted to flee a panic-inducing scene in which plain clothed officers in tactical gear rushed toward his car in non-descript vehicles without police lights.

124.    Mr. Radomski reasonably panicked and tried to exit via clear paths of egress, and never intentionally drove at, or otherwise posed any danger to the officers.

125.    The Individual Defendants did not know who was in the car and had already identified and detained the subject of their warrant.

126.    Rather than take normal steps to pursue and/or detain Mr. Radomski for attempting to flee the scene of the incidental collision with an unmarked police vehicle, the Individual Defendants indiscriminately opened fire into the car.

127.    The Individual Defendants acted recklessly with gross negligence and/or malice when they breached their duty to Mr. Radomski, shooting him at least six times, thereby causing severe and life-threatening injuries.

128.    Even if the Individual Officers perceived some danger from Mr.

Radomski's attempt to flee the scene, they had a duty to mitigate the danger to everyone at the scene.

129.    Rather than attempt to avoid danger, the Individual Defendants intentionally and recklessly escalated the situation.

130.    Even when Mr. Radomski's car was moving slowly *away* from the Individual Defendants, they continued to shoot at the car, even chasing after the car to fire additional rounds into the passenger compartment.

131.    The Individual Defendants demonstrated ill-will, evil intent, and wrongful motive toward Mr. Radomski when they made the deliberate decision to discharge their weapons at Mr. Radomski's car in a manner certain to maim or kill Mr. Radomski.

132.    As a direct and proximate result of Individual Defendants' gross negligence, Mr. Radomski suffered severe physical and mental injuries that will require comprehensive medical care for the remainder of his life.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

### COUNT VII
### *Negligence*
### All Defendants

133.    The preceding paragraphs are incorporated herein.

134.   The Defendants owed Mr. Radomski various common law and constitutional duties outlined above.

135.   The Defendants breached that duty in ways described in the preceding paragraphs.

136.   As a direct and proximate result of Individual Defendants' negligence, Mr. Radomski suffered severe physical and mental injuries that will require comprehensive medical care for the remainder of his life.

WHEREFORE, Shane Radomski, by and through Jacob Lee Rose, the legal guardian of his person and property, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Date: August 2, 2023

KEILTY BONADIO, LLC

/s/ *Thomas W. Keilty, III*
Thomas W. Keilty, III (Bar No. 18992)
tkeilty@kblitigation.com
Nicholas C. Bonadio (Bar No. 13679)
nbonadio@kblitigation.com
One South Street, Suite 2125
Baltimore, Maryland 21202
Tel: (410) 646-8880
Fax: (855) 595-2385

Jay D. Miller (Bar No. 04653)
Angelos Law, P.C.
Jmiller@lawpga.com
One Charles Center
100 N. Charles St. 20th Floor
Baltimore, Maryland 21201
Tel: (410) 649-2000
Fax: (410) 649-2151

Raphael J. Santini (Bar No. 05128)
crimadmin@santinilegal.com
RAPHAEL J. SANTINI, P.A.
9736 Harford Road
Baltimore, Maryland 21234
Tel: (410) 665-9433
Fax: (410) 665-8439

*Attorneys for Plaintiff*