IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JACOB LEE ROSE,

      *Plaintiff*,

    v.                                 **Civil No.: 1:23-cv-02078-JRR**

BALTIMORE COUNTY, MARYLAND,
*et al.*,

      *Defendants*.

## MEMORANDUM OPINION

Plaintiff Jacob Lee Rose, as Guardian of Person for Shane Radomski, filed this action against Defendants Baltimore County, Maryland ("the County"), Officer G. Depew, Officer R. Johnson, Officer B. Lange, and Officer J. Trenary (collectively, "Officer Defendants"). (ECF No. 1; the "Complaint"). Pending now before the court are two motions: Officer Defendants' Motion for Judgment on the Pleadings or for Summary Judgment[1] (ECF No. 14; "Officer Defendants' Motion") and the County's Motion for Judgment on the Pleadings or for Summary Judgment (ECF No. 15; "the County's Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, the Officer Defendants' Motion and the County's Motion, construed as motions for judgment on the pleadings, will be GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND[2]

Plaintiff Jacob Lee Rose is the appointed legal guardian of Shane Radomski. (ECF No. 1 ¶ 6.) Plaintiff initiated this action as Mr. Radomski's guardian based on an incident involving

---

[1] Officer Defendants' Motion is titled "Motion for Judgment on the Pleadings," but seeks summary judgment in the alternative.

[2] For purposes of resolving the Motions, the court accepts as true all well-pled facts set forth in the Complaint. (ECF No. 1.) *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Officer Defendants that left Mr. Radomski with permanent physical and mental disabilities. *Id.* ¶ 5.

On April 14, 2022, Officer Defendants were attempting to serve an arrest warrant upon a suspect, Brian Rodriguez, for his alleged involvement in a 2021 murder. *Id.* ¶ 15. Officer Defendants, law enforcement officers involved in the County's Criminal Apprehension Support Team, attempted to serve the arrest warrant in a parking lot located at Avon Road and Maryland Avenue in Dundalk, Maryland. *Id.* ¶¶ 13, 16, 38. Mr. Radomski was not the subject of the arrest warrant but was merely in the parking lot when Officer Defendants attempted to serve the arrest warrant. *Id.* ¶¶ 14, 17–18.

Shortly after 12:40 p.m., Mr. Radomski, Mr. Rodriguez, and another man were in the parking lot when four unmarked vehicles rushed to surround them from the front ends of their parked vehicles. *Id.* ¶¶ 17–18. No vehicles had emergency lights, but a siren was audible. *Id.* ¶ 18. As Officer Defendants' vehicles approached, Mr. Rodriguez and the other man (both of whom were standing in the lot) raised their hands over their heads and began lowering themselves to the ground. (Ex. C, "Wyze Footage," ECF No. 14-4 at 1:09–1:14; ECF No. 1 at fig. 1, ¶ 20.)[3] Officer Defendants, in plain clothes with tactical vests, exited their vehicles with their guns drawn. (Wyze Footage, ECF No. 14-4 at 1:12; ECF No. 1 ¶ 19.) Officer Defendants knew that the driver of Mr. Radomski's vehicle (a Nissan) "was not the target of their warrant, but they took no steps to identify the driver" of Mr. Radomski's vehicle. (ECF No. 1 ¶ 29.) Mr. Radomski then attempted to flee in his vehicle by heading toward an open pathway in the lot. (Wyze Footage, ECF No. 14-4 at 1:12–1:15; ECF No. 1 at fig. 1, ¶ 20.) As he attempted to flee, Mr. Radomski's vehicle came close to hitting one of the two men lowering to the ground. (Wyze Footage, ECF No. 14-4 at 1:12–

---

[3] Addressed more fully below in Section II.B, the court finds the Wyze Footage is incorporated into the Complaint.

1:15; ECF No. 1 at fig. 1.)  As Mr. Radomski drove toward "an open area of egress, another non-descript police vehicle, a large SUV driven by [Officer Defendant Trenary],[4] entered [the] oncoming lane of traffic where Mr. Radomski had the right of way, and caused a collision," contrary to the County's policy and Maryland traffic laws and regulations.  (Wyze Footage, ECF No. 14-4 at 1:12–1:15; ECF No. 1 at fig. 2, ¶¶ 20–23.)  Mr. Radomski's vehicle collided with the SUV.  (Wyze Footage, ECF No. 14-4 at 1:12–1:15; ECF No. 1 at fig. 2, ¶ 22.)  Then, with no persons in his direct path, Mr. Radomski reversed his vehicle a short distance.  (Wyze Footage, ECF No. 14-4 at 1:15–1:20; ECF No. 1 at fig. 3, ¶¶ 23–24.)  He again attempted to "navigate toward a clear area of egress" and to avoid the SUV.  (Wyze Footage, ECF No. 14-4 at 1:20–1:23; ECF No. 1 at fig. 4, ¶ 23.)  The video shows no person in front of Mr. Radomski's vehicle at this time.  (Wyze Footage, ECF No. 14-4 at 1:20–1:23; ECF No. 1 at fig. 4, ¶ 25.)  As Mr. Radomski moved forward through a space between the Officer Defendants' vehicles, and after Mr. Radomski's vehicle had already partially passed Officer Defendant Trenary's person, Officer Defendant Trenary shot at Mr. Radomski through Mr. Radomski's front windshield, contrary to the County's Use of Force Policy.  (Wyze Footage, ECF No. 14-4 at 1:20–1:23; ECF No. 1 at fig. 4, ¶¶ 25, 27, 32.)  Mr. Radomski's vehicle stopped again with no apparent exit available.  (Wyze Footage, ECF No. 14-4 at 1:24; ECF No. 1 at fig. 6.)  Officer Defendant Trenary then fired additional shots at Mr. Radomski's vehicle.  (Wyze Footage, ECF No. 14-4 at 1:23–1:27; ECF No. 1 ¶ 27.)  Mr. Radomski reversed again into one of the Officer Defendants' vehicles while they began shooting into his vehicle contrary to the County's Use of Force Policy.  (Wyze Footage, ECF No. 14-4 at 1:24–1:32; ECF No. 1 ¶¶ 28, 31–32.)  No persons appear to be in Mr. Radomski's projected path while he reversed, with two of the officers behind another vehicle.  (Wyze Footage,

---

[4] Although the Officer Defendant driving the SUV is not identified by name in the Complaint, all parties identify him at Officer Defendant Trenary in subsequent briefing.  (ECF No. 14-1 at p. 3; ECF No. 18 at p. 8.)

ECF No. 14-4 at 1:24–1:32; ECF No. 1 ¶ 28.)  Officer Defendants appear to keep shooting at Mr. Radomski's vehicle even after it comes to a stop.[5]  (Wyze Footage, ECF No. 14-4 at 1:28–1:31.)

Despite Officer Defendants being "easily able to maintain a position of safety while" Mr. Radomski "attempted to escape the scene," they fired "dozens of bullets" and shot Mr. Radomski approximately twelve (12) times, including in his wrists, shoulders, back, arms, and head.  (ECF No. 1 ¶¶ 31, 33, 35.)  Officer Defendants "did not begin shooting until it was patently obvious that the unknown driver was attempting to *leave* the scene, not use his car 'against'" them.  *Id.* ¶ 35. (emphasis in original).  As a result of the gunshots, Mr. Radomski "suffered acute respiratory failure, hypoxia, pneumonia, pleural effusion, acute [deep vein thrombosis], traumatic brain injury, seizures," as well as "other severe mental and physical injuries."  *Id.* ¶ 47.

No Officer Defendant operated a body-worn camera during the incident.  *Id.* ¶ 36.  In fact, the County has excluded the Criminal Apprehension Support Team from its dashboard and body-worn camera programs that, at least in part, require "that the camera be activated during pursuits, arrests, field interviews, traffic stops, execution of all warrants, emergency vehicle operations, and any 'other activities of a potentially confrontational nature.'"  *Id.* ¶ 41.  The Chief of Police for the County has discretion over which County police department units are outfitted with dashboard and body-worn cameras.  *Id.* ¶ 46.  Plaintiff further alleges that the County has "instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights." (ECF No. 1 ¶ 78.)  In support thereof, Plaintiff notes, *inter alia*, that the County lacks an internal affairs procedure for controlling and monitoring excessive force by officers, and that the County fails to report incidents of excessive force to any person with supervisory authority.  *Id.* ¶¶ 81, 93.

---

[5] Officer Defendants contend that the apparent sounds of gun shots fired at Mr. Radomski's vehicle after it had come to a stop is due to an audio delay in the footage.  (ECF No. 21 at p. 8.)

Plaintiff further identifies other incidents of purported excessive force exercised by County law enforcement officers, including an incident in which Officer Defendant Trenary shot a driver while attempting to serve a warrant.  *Id.* ¶¶ 44, 79.

On August 2, 2023, Plaintiff initiated this action against the County and Officer Defendants, asserting the following counts:

> Count I: Common Law Battery against Officer Defendants;
>
> Count II: Excessive Force in Violation of 42 U.S.C. § 1983 against Officer Defendants;
>
> Count III: A *Monell*[6] Claim Based on Excessive Force in Violation of 42 U.S.C. § 1983 against the County;
>
> Count IV: Excessive Force in Violation of Articles 24 and 26 of the Maryland Declaration of Rights against all Defendants;
>
> Count V: A *Longtin*[7] Claim Based on Excessive Force in Violation of Articles 24 and 26 of the Maryland Declaration of Rights against the County;
>
> Count VI: Common Law Gross Negligence against Officer Defendants; and
>
> Count VII: Common Law Negligence against all Defendants.

(ECF No. 1 ¶¶ 54–136.)  The County filed its answer on October 19, 2023 (ECF No. 11), and Officer Defendants filed their answer on October 27, 2023 (ECF No. 12).  On November 11, 2013, the County and Officer Defendants filed their Motions, seeking judgment on all of Plaintiff's claims.  (ECF Nos. 14, 15.)

---

[6] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. 658, 694 (1978).

[7] As discussed more fully below, a *Longtin* claim is the state analogue to a *Monell* claim.

## II.   **LEGAL STANDARD**

All Defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or, alternatively, for summary judgment under Rule 56.  Although Defendants do not explain why the court should or might construe the Motions as ones for summary judgment versus judgment on the pleadings, the court construes the Motions to seek conversion under Rule 12(d).  Federal Rule of Civil Procedure 12(d) provides, "[i]f, on a motion under [Rule 12(c)], matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d).  "Pursuant to Rule 12(d), the Court has discretion to determine whether to accept evidence outside the pleadings, and thus convert a [Rule 12(c)] motion to a Rule 56 motion."  *Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 WL 5335477, at *3 (D. Md. Sept. 22, 2016) (citations omitted).  "There are two requirements for a proper Rule 12(d) conversion."  *Greater Balt. Ctr. for Pregnancy Concerns. Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013).  "First, all parties must 'be given some indication by the court that it is treating the [Rule 12(c)] motion as a motion for summary judgment,' which can be satisfied when a party is aware 'material outside the pleadings is before the court.'"  *Snyder v. Maryland Dep't of Transportation*, No. CV CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)).  Second, customarily, the parties must first "be afforded a reasonable opportunity for discovery."  *Gay*, 761 F.2d at 177.

As of the filing of the Motions, the parties do not appear to have engaged in discovery. (ECF No. 13.)  Moreover, Plaintiff avers that discovery is required as to the use of excessive force and the reasonableness of Officer Defendants' use of force.  (ECF No. 18 at p. 12–13.)  Further, although Plaintiff does not challenge the authenticity of materials Defendants append to the

Motions, Plaintiff objects that video footage exhibits have been trimmed and at least one documentary exhibit appears to be an incomplete, self-selected compilation of certain portions of larger files. *Id.* at p. 13, 15 n.4. Importantly, Defendants offer no basis for the admissibility of their exhibits. *See* Fed. R. Evid. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.") and Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In view of the foregoing, and because Defendants have not advanced a discernable basis for the court to exercise its discretion to convert the Motions, the court declines to convert the Motions to Rule 56 motions.

### A.  Rule 12(c): Motion for Judgment on the Pleadings

A party may move for judgment on the pleadings after the pleadings are closed, so long as the motion is made early enough not to delay trial. Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standard applicable to motions to dismiss under Rule 12(b)(6)." *Green v. Sw. Credit Sys., L.P.*, 220 F. Supp. 3d 623, 624 (D. Md. 2016) (citing *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009)). A Rule 12(c) motion, like a Rule 12(b)(6) motion, does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, in considering a Rule 12(c) motion, the court "assume[s] all well-pled facts to be true and draw[s] all reasonable inferences in favor of" the non-moving party. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 702 (4th Cir. 2016). The court "may also accept as true factual allegations in the Answer[], but only where they do not contradict the allegations in the

7

Complaint." *Al-Sabah v. World Bus. Lenders, LLC*, No. CV SAG-18-2958, 2020 WL 3868989, at *8 (D. Md. July 9, 2020).[8]  "A motion for judgment on the pleadings pursuant to Rule 12(c), . . . should not be granted unless it appears to a certainty that the non-moving party cannot prove any set of facts in support of its claim that would entitle it to relief." *United States v. Castillo*, No. 8:19-CV-3459-PWG, 2021 WL 825974, at *3 (D. Md. Mar. 4, 2021) (citing *Shooting Point, L.L.C. v. Cumming*, 238 F. Supp. 2d 729, 735 (E.D. Va. 2002), *aff'd*, 368 F.3d 379 (4th Cir. 2004)).

### B.  Consideration of Exhibits

In support of their Motions, Defendants attach a number of exhibits, including documents that appear to be from a police report or record (Ex. A, ECF No. 14-2); selective video footage of the incident at issue from a Ring camera (Ex. B, ECF No. 14-3), a Wyze camera (the earlier referenced Wyze Footage, ECF No. 14-4), and a dashboard camera of a non-party (Ex. E, ECF No. 14-6); and a screen capture from Google Maps (Ex. D, ECF No. 14-5).

The court is entitled to "consider documents that are explicitly incorporated into the complaint by reference, and those attached to the complaint as exhibits" as part of the "pleading for all purposes." *Goines v. Valley Comm. Svcs. Bd*., 822 F.3d 159, 165–66 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) and FED. R. CIV. P. 10(c)); FED. R. CIV. P. 10(c) (pertaining to "written instruments" attached as exhibits to a pleading).  In his Complaint, Plaintiff incorporates six still images from the Wyze Footage (Ex. C to the Officer Defendants' Motion, ECF No. 14-4) and makes continuous reference to the footage throughout the Complaint to aid the reader's understanding and navigation of the "Facts Common to All

---

[8] This is based on the rationale that a plaintiff is not "required to reply to defendant's answer," and so "all allegations in the answer are deemed denied." *First Protective Ins. Co. v. Rike*, 516 F. Supp. 3d 513, 524 (E.D.N.C. 2021) (citation omitted); *see Lefkoe v. Jos. A. Bank Clothiers*, No. CIV.WMN-06-1892, 2008 WL 7275126, at *3 (D. Md. May 13, 2008) ("[T]the factual allegations in the answer also may be taken as true to the extent they have not been denied or do not conflict with the complaint."  (citation omitted)); and FED. R. CIV. P. 8(b)(6) ("If a responsive pleading is not required, an allegation is considered denied or avoided.").

Counts" portion of the Complaint.  Although the Wyze Footage is not attached as a physical exhibit to the Complaint, and is not a "written instrument," the court finds it is sufficiently incorporated into the Complaint for the court to consider it in accordance with the above-cited authority.  *See also Est. of Green v. City of Annapolis,* 696 F. Supp.3d 130, 149 (D. Md. 2023) (discussing court's examination of body-worn camera footage referenced in the plaintiff's complaint and in opposition to a motion to dismiss); *Nalls v. Baltimore Co.,* No. CV ELH-23-0183, 2024 WL 1140688, at *8–9 (D. Md. Mar. 15, 2024) (same).

With respect to defense exhibits other than the Wyze Footage, as with a Rule 12(b)(6) motion, the court generally does not consider evidence outside of the Complaint when ruling on a Rule 12(c) motion.  The court may, however, consider "documents integral to and relied upon in the complaint, . . . so long as the plaintiff does not question their authenticity." *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021).  "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).  The video footage at Exhibits B, C, and E show different vantage points of the incident underlying this action, and (as set forth above) Wyze Footage still images are included and referenced throughout Plaintiff's Complaint.  (ECF No. 14-1 at p. 2 n.2; ECF No. 18 at p. 13.)  The parties all contend that the court may consider the video exhibits as integral to the Complaint.  (ECF No. 14-1 at p. 2 n.2; ECF No. 18 at p. 5 n.1.)  Other than the Wyze Footage, the court declines to consider the remaining exhibits, as they were not clearly relied upon by Plaintiff or integral to the Complaint; further, notwithstanding the parties' apparent agreement on this issue, the court has unresolved doubt that the video footage itself gives rise to legal rights Plaintiff asserts.  (ECF No. 18 at p. 15

n.4.)  *See Doriety v. Crenshaw,* 109 F.4th 670, 679–80 (4th Cir. 2024) (addressing consideration of video recording on motion to dismiss and declining to reach the question of whether the video was integral to the complaint on the basis that plaintiff had relied on the video in opposition to motion to dismiss).

III.   <u>**ANALYSIS**</u>

While Defendants filed separate Motions, they advance interrelated arguments.  Officer Defendants contend they are entitled to judgment on all counts against them, because: (1) they are immune from liability for Plaintiff's negligence claim; (2) their conduct was reasonable under the Fourth Amendment; and (3) even if not reasonable, they are entitled to qualified immunity on Plaintiff's federal claim.  (ECF No. 14-1 at p. 6–13.)  Relatedly, the County argues that it, too, is entitled to judgment on all counts against it, because: (1) it is immune from liability for Plaintiff's negligence claim; (2) it is not liable where Officer Defendants' conduct was objectively reasonable; and (3) even if not reasonable, Plaintiff has failed to allege a *Monell* or *Longtin* claim. (ECF No. 15-1 at p. 4–8.)   In response, Plaintiff contends that Defendants' arguments as to reasonableness and qualified immunity turn on disputed facts, and that he has pled sufficient facts to assert *Monell* and *Longtin* claims.  (ECF No. 18 at p. 15–30; ECF No. 19 at p. 3–9.)  Plaintiff also argues that judgment should not be entered on his negligence claim against the Officer Defendants because a reasonable jury could conclude they acted with gross negligence.  (ECF No. 18 at p. 31.)

**A.  Excessive Force Claims**

Plaintiff's claims under both § 1983 and Articles 24 and 26 of the Maryland Declaration of Rights, as well as his state common law tort claims, all rest on allegations of excessive force. Plaintiff's claims of excessive force are grounded in the Fourth Amendment to the United States

Constitution. *Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding that "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person," is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996). Relatedly, Article 26 of the Maryland Declaration of Rights provides that "all warrants, without oath or affirmation, . . . to seize any person or property, are grievous and oppressive." MD. CONST. DECL. OF RTS. ART. 26. Article 24 of the Maryland Declaration of Rights provides that no person "ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." MD. CONST. DECL. OF RTS. ART. 24. "Maryland Declaration of Rights Articles 24 and 26 prohibit employment of excessive force during a seizure. The standards for analyzing claims under these articles are the same as for analyzing Fourth Amendment claims." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (quoting *Randall v. Peaco,* 175 Md. App. 320, 330 (2007)).

   1. <u>42 U.S.C. § 1983</u>

   "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred," including, relevant here, the Fourth Amendment. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n.3 (1979)). Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  To state a claim under section 1983, Plaintiffs "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

    2.  <u>Reasonableness</u>

    As stated above, a "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person' . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.'" *Graham*, 490 U.S. at 388. The *Graham* Court held:

> [A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id.* at 394–95.

    On the reasonableness standard, the Fourth Circuit has explained:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v.*

> *Wolfish,* 441 U.S. 520, 559 (1979). But the Court has counseled that
> the test "requires a careful balancing of the nature and quality of the
> intrusion on the individual's Fourth Amendment interests against the
> countervailing governmental interests at stake." *Smith v. Ray,*
> 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham,* 490 U.S. at 396).

*Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst,* 810 F.3d 892, 899 (4th Cir. 2016).

Thus, three factors guide the court's balancing of a plaintiff's Fourth Amendment interests, including: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (same).

"Because deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019).  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Even still, "a 'significant threat of death or serious physical injury' to an officer does not justify the use of deadly force unless the threat is 'immediate.'" *Williams*, 917 F.3d at 769 (quoting *Garner*, 471 U.S. at 3, 11).  A police officer who shoots a fleeing suspect without such probable cause "violates that suspect's Fourth Amendment rights." *Henry v. Purnell*, 652 F.3d 524, 531–32 (4th Cir. 2011) (quoting *Garner*, 471 U.S. at 11).

The Fourth Circuit's decision in *Williams* provides further instruction on the use of deadly force against a suspect in a vehicle attempting to flee:

> [W]e applied these principles when deciding *Waterman v. Batton*, a
> case that bears striking similarities to the one at hand. There, we held
> that officers who used deadly force against the driver of a car had
> not violated the Fourth Amendment when, in the aftermath of a
> high-speed chase (during which the driver had reportedly tried to
> run an officer off the road), the officers were standing in or

13

immediately adjacent to the car's forward trajectory, and the car "lurched forward" and "began to accelerate," such that the officers reasonably believed that the car was going to run them over "in approximately one second." 393 F.3d at 474–76, 475 n.6. We also held that the same officers *had* violated the Fourth Amendment to the extent that they started to use deadly force, or continued to use deadly force, once the car had driven by them—i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their fellow officers) over. *Id.* at 482. This was true even though mere seconds separated the point at which deadly force was lawful from the point at which deadly force was unlawful. *Id.* As we put it then, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Id.* at 481.

Following *Waterman*, we have no difficulty concluding that if Strickland and Heroux started or continued to fire on Williams after they were no longer in the trajectory of Williams's car, they violated Williams's Fourth Amendment right to freedom from excessive force.

*Williams*, 917 F.3d at 769 (emphasis in original).  *Cf. Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect.").

The factual allegations before the court based on Plaintiff's Complaint (taken as true) are as follows:  Officer Defendants were attempting to serve an arrest warrant on someone other than Mr. Radomski; Officer Defendants knew that Mr. Radomski was not the subject of the arrest warrant; Officer Defendants knew that the driver of Mr. Radomski's Nissan was not the target of the warrant; Officer Defendants surrounded Mr. Radomski's vehicle and two other vehicles in four unmarked vehicles with at least one audible siren; two men (neither Mr. Radomski) standing in the parking lot immediately raised their arms and lowered to the ground; Mr. Radomski attempted to flee in his vehicle during which he almost made contact with one of the men on the ground; Mr. Radomski drove his vehicle into Officer Defendant Trenary's SUV, which had approached contrary to the flow of oncoming traffic; Mr. Radomski then reversed his vehicle a short distance

14

at a slow speed while no person was in his projected path; Mr. Radomski again pulled forward into an "open area of egress" in a space left between two of the Officer Defendants' vehicles again with no visible person in his projected path; Officer Defendant Trenary fired a shot at Mr. Radomski through the front windshield of his vehicle after Mr. Radomski's vehicle had partially passed him; and Officer Defendants opened fired after Mr. Radomski reversed his vehicle while no person appeared to be in his projected path, although two officers were behind a vehicle that was in his projected path.  (ECF No. 1 ¶¶ 15, 18, 25, 29; Wyze Footage, ECF No. 14-4 at 1:05–1:31.)

In light of the Fourth Circuit's discussion in *Waterman* and *Williams*, Plaintiff's allegations that he was shot while no officer or other person was in the trajectory of his vehicle plausibly alleges a violation of his Fourth Amendment right.  This conclusion is further supported by the *Graham* factors.  Based on Plaintiff's allegations, Mr. Radomski's only apparent offense was fleeing the scene of an accident, a misdemeanor.  (ECF No. 14-1 at p. 10 n.6.)  *See Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) ("When the offense is a 'minor one,' we have found 'that the first *Graham* factor weighed in plaintiff's favor.'") (quoting *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003)).  As already discussed, Plaintiff has alleged that Mr. Radomski did not pose an immediate threat to the Officer Defendants or others when they shot at him—the fact that Defendants dispute this is not persuasive at this stage.  And finally, Plaintiff has alleged that Mr. Radomski was not resisting arrest or attempting to evade arrest because he was not the subject of the arrest warrant that Officer Defendants were attempting to serve; Officer Defendants knew that the driver of the Nissan (Mr. Radomski's vehicle) was not their target.[9]  In sum, Plaintiff plausibly alleges that Officer Defendants' use of force against Mr. Radomski was unreasonable.

---

[9] Officer Defendants note that, because Mr. Radomski had potentially committed misdemeanors in their presence, he was "fleeing the scene."  (ECF No. 21 at p. 11.)  True or not, this yields nothing in their favor at this juncture.

*Waterman,* on which Officer Defendants rely, does not produce a different outcome at this stage of litigation.  In *Waterman*, the Fourth Circuit reviewed a denial of summary judgment by the district court and held that the officers were entitled to qualified immunity.  *Waterman v. Batton*, 393 F.3d 471, 483 (4th Cir. 2005).  The Fourth Circuit considered the following relevant facts in the record:

> As Waterman drove toward the plaza at a normal speed, keeping a safe distance from vehicles in front of him, five uniformed MdTA officers—Appellants and Officers Sean Hames and Lance Bellman—emerged from around the concrete island located between lanes 11 and 12. With their weapons drawn, the officers approached Waterman's vehicle from the front and passenger sides, yelling for Waterman to stop.

> Waterman slowed as he approached the toll plaza, then coasted for about one second at approximately 11 miles per hour. The vehicle ahead of Waterman's then began to move forward. Immediately thereafter, the rear of Waterman's vehicle dipped down and rose back up—a motion the officers described as "lurching" or "lunging" forward—and Waterman began to accelerate in the general direction of the toll plaza and the officers ahead of him. At the instant of acceleration, Officer Keel was about 72 feet ahead of the vehicle; Officer Heisey, 38 feet ahead; Officer Hames, a little more than 23 feet ahead; and Officer Batton, a little more than 16 feet ahead. Although none of the officers were directly in front of Waterman's vehicle, they stood only a few feet to the passenger side of the vehicle's projected path.

> Perceiving the lurching of the vehicle and Waterman's acceleration as the beginning of an attempt to run them over, Appellants began firing their weapons as soon as Waterman accelerated. As the officers shot at him, Waterman's vehicle reached a top speed of approximately 15 miles per hour. Waterman's vehicle then passed all of the officers, avoiding them by several feet and temporarily stopping behind another vehicle blocking its path. As Appellants scrambled toward Waterman, they continued to fire their weapons at him from the passenger side of the vehicle and from behind, ceasing their fire as he passed through the toll plaza.

*Id.* at 474–75 (footnotes omitted).  Although the court ultimately held the officers were entitled to qualified immunity, the Fourth Circuit determined that a reasonable factfinder could conclude that the officers used unconstitutional excess force when they shot at Waterman's vehicle:

> [O]nce Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots. A factfinder could reasonably conclude that as the officers pursued Waterman's vehicle, they knew or should have known that Waterman had passed them without veering in their direction. Under these circumstances, a reasonable factfinder could determine that any belief that the officers continued at that point to face an imminent threat of serious physical harm would be unreasonable.

*Id.* at 482.  Moreover, as discussed *supra*, the Fourth Circuit in *Williams* confirmed that officers violate the Fourth Amendment where they use deadly force, or continue to use deadly force, "once the car had driven by them—i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their fellow officers) over." *Williams*, 917 F.3d at 769 (citing *Waterman*, 393 F.3d at 482).   "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman*, 393 F.3d at 481.

Based on *Williams* and *Waterman,* Plaintiff ably alleges Officer Defendants engaged in the use of unconstitutional excess force: Officer Defendants fired at Mr. Radomski while he was driving away from them, and pursued him after they assumed a position of safety (ECF No. 1 ¶¶ 27, 31); and Officer Defendants did this despite knowing in fact that Mr. Radomski was not the subject of their arrest warrant and that the target was not in Mr. Radomski's car, *id.* ¶ 29.  The court appreciates that Officer Defendants hotly contest Plaintiff's account, but that is a dispute to be resolved another day.  Moreover, the video footage, without more, does not plainly contradict Plaintiff's allegations.

Accordingly, the court will deny Officer Defendants' Motion as to Counts I, II, III, IV, V, and VI, and the County's Motion as to Counts III, IV, and V on this basis.  Because all Defendants'

arguments with respect to Counts I, IV, and VI are premised on the reasonableness of Officer Defendants' conduct, the Motions will be denied to the extent they seek judgment as to same.  The court addresses below Defendants' respective additional arguments as to Counts II, III, and V.

    3.  <u>Qualified Immunity</u>

Officer Defendants also argue that they are entitled to judgment on Count II, even if their actions were objectively unreasonable, because they are entitled to qualified immunity.  (ECF No. 14-1 at p. 12–13.)  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense.  The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).  A government official sued in his individual capacity may invoke the protection afforded by qualified immunity.  *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013).  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558–59 (4th Cir. 2005).  However, because

one of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government,'" the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (quoting *Harlow*, 457 U.S. at 817). A defendant may therefore assert the defense of qualified immunity on a motion to dismiss, "[s]o long as qualified immunity does not turn on *disputed facts*." *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) (emphasis in original). If the court determines that a government official took action that a reasonable officer would have believed was lawful, the official is entitled to dismissal before discovery. *See Anderson*, 483 U.S. at 646 n.6. "[W]hen asserted at this early stage in the proceedings, 'the [qualified immunity] defense faces a formidable hurdle' and 'is usually not successful.'" *Owens v. Balt. City State's Atty's. Off.*, 767 F.3d 379, 396 (4th Cir. 2014). (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). Thus, where a plaintiff "has alleged facts violative of [his] constitutional right," and a right is clearly established, a quality immunity defense is "unavailing" at an early stage of litigation. *Summerville v. Neekson*, No. CV ELH-23-1290, 2024 WL 3013169, at *6 (D. Md. June 14, 2024); *see also Canty v. Bishop*, No. CV SAG-21-3151, 2023 WL 284446, at *7 (D. Md. Jan. 18, 2023) (declining to decide the issue of qualified immunity based on disputed facts where a defendant moved to dismiss or alternative for summary judgment); *Clark v. Portmess*, No. CV SAG-20-1819, 2021 WL 5233560, at *6 (D. Md. Nov. 10, 2021) (same).

 "Determining whether qualified immunity is appropriate is a two-step inquiry." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (citing *Pearson*, 555 U.S. at 232). "[T]he court must examine (1) whether the facts illustrate that the officer violated the plaintiff's constitutional right to be free from unreasonable seizures, and (2) whether the right was clearly established at the

time of the alleged event such that 'a reasonable officer would have understood that his conduct violated the asserted right.'" *Humbert*, 866 F.3d at 555 (quoting *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007)). "The answer to both questions must be in the affirmative to defeat the officer's entitlement to immunity." *Id.*

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). "[I]n the light of pre-existing law, the unlawfulness must be apparent." *Id.* (quoting *Anderson*, 483 U.S. at 640). "The 'salient question' is whether the state of the law at the time of the events in question gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope*, 536 U.S. at 741).

Officer Defendants contend that "there was no case law that would have placed [them] on notice that, in this specific factual situation, firing on Mr. Radomski's vehicle as part of a split-second decision in a rapidly changing situation would have been a violation of any federal right." (ECF No. 14-1 at p. 13.) Plaintiff counters that applicable law at the time of the incident clearly establishes that use of deadly force violates the Fourth Amendment unless the suspect poses a significant threat of death or serious personal injury to the officer or others. (ECF No. 18 at p. 27.) In reply, Officer Defendants assert that Plaintiff's argument is unavailing because there were people in the path of Mr. Radomski's vehicle who were at risk of serious injury. (ECF No. 21 at p. 13.) As noted above, this material fact is subject to dispute not obviously resolved by the court's viewing of the Wyze Footage.[10] (ECF No. 1 ¶¶ 25, 27, 31, 124; ECF No. 14-1 at p. 8–9; ECF No. ECF No. 21 at p. 13.)

---

[10] Similarly, the Complaint's allegations are not plainly contradicted by the Wyze Footage.

Both parties acknowledge the controlling law in this circuit:

> (1) [L]aw enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory.

*Williams*, 917 F.3d at 770 (citing *Waterman*, 393 F.3d at 480–82).   Thus, Officer Defendants'

assertion of materially disputed facts bearing on whether Mr. Radomski's allegedly violated right

was "clearly established" at the time Officer Defendants shot him do not militate in favor of the

outcome they seek at this time; a finding as to qualified immunity is premature.  *See Summerville*

*v. Neekson*, No. CV ELH-23-1290, 2024 WL 3013169, at *6 (D. Md. June 14, 2024) (concluding

that the qualified immunity defense was "unavailing" on a motion to dismiss where the plaintiff

had "alleged facts violative of the constitutional right").   The court will therefore deny Officer

Defendants' Motion as to Count II on grounds of qualified immunity.

### B. *Monell* and *Longtin* Claims

The County argues that, regardless of the court's conclusion regarding the reasonableness

of Officer Defendants' use of force, it is entitled to judgment on Count III, Plaintiff's *Monell* claim,

and Count V, Plaintiff's *Longtin* claim, because Plaintiff fails to state a claim.  (ECF No. 15-1 at

p. 6–8.)

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress

intended "municipalities and other local government units to be included among those persons to

whom § 1983 applies."   436 U.S. 658, 690 (1978).   The Court further explained that "[l]ocal

governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive

relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.*

As with a *Monell* claim, "the Maryland Constitution recognizes a 'pattern or practice' claim as part of its protections of citizens against unconstitutional actions of local government and its employees." *Prince George's Cnty. v. Longtin*, 419 Md. 450, 500 (2011). Such a claim, referred to as a *Longtin* claim, is "[t]he state analogue to a *Monell* claim." *Palma v. Montgomery Cnty., Maryland*, 598 F. Supp. 3d 288, 297 n.5 (D. Md. 2022); *see Devi v. Prince George's Cnty.*, No. CV DKC 16-3790, 2017 WL 3592452, at *4 (D. Md. Aug. 21, 2017) ("Maryland, like the federal government, imposes liability on municipalities for widespread patterns or practices that cause constitutional injuries." (citations omitted)). This court routinely analyzes *Monell* and *Longtin* claims together.[11] *See, e.g.*, *Talley v. Anne Arundel Cnty., Maryland*, No. CV RDB-21-347, 2021 WL 4244759, at *13–14 (D. Md. Sept. 17, 2021); *Grim v. Balt. Police Dep't*, No. CV ELH-18-3864, 2019 WL 5865561, at *26 (D. Md. Nov. 8, 2019); *Devi*, 2017 WL 3592452, at *4.

In asserting a *Monell* claim (and thus a *Longtin* claim), Plaintiff must "adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Such claims have two components: "(1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1015 (D. Md. 2019) (citing *Bd. of Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 403 (1997)). A policy or custom that purports to give rise to liability will "not, however, 'be inferred merely from

---

[11] The claims are distinct, however, in that, unlike federal law, "Maryland law imposes *respondeat superior* liability on municipalities for the State constitutional violations of its employees." *Grim v. Balt. Police Dep't*, No. CV ELH-18-3864, 2019 WL 5865561, at *26 (D. Md. Nov. 8, 2019).

municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" *Id.* (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984)).   The municipality's conduct must demonstrate "'deliberate indifference' to the rights of its inhabitants." *Id.* (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)).   Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.[12]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217).   Regardless of which theory a plaintiff proceeds under, all *Monell* claims have three essential elements: (1) identification of a specific "policy or "custom"; (2) attribution of the policy, and fault for its creation, to the municipality; and (3) an "affirmative link" between an identified policy or custom and a specific rights violation.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

While it is true that often "a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery" and that "courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers," "boilerplate allegations will not suffice."  *Saltz v. City of Frederick,*

---

[12] As discussed in more detail below, the fourth type is commonly referred to as a "condonation theory" of liability.

*MD*, 538 F. Supp. 3d 510, 556–57 (D. Md. 2021).   "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403.   *Monell* claims survive the motion to dismiss stage if the plaintiff alleges facts to support that the defendant "was aware of ongoing constitutional violations" and "did nothing to stop or correct those actions."   *Smith v. Aita*, No. CV CCB-14-3487, 2016 WL 3693713, at *4 (D. Md. July 12, 2016), *aff'd*, 711 F. App'x 163 (4th Cir. 2018); *see Garcia v. Montgomery Cnty., Md.*, No. CIV. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013) (denying motion to dismiss where the plaintiff alleged that the defendant "was aware of the ongoing constitutional violations by [] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop").

Neither party tailors their arguments as to Plaintiff's *Monell* claim (and related *Longtin* claim) according to the particular available liability theories described above.   Drawing all reasonable inferences in Plaintiff's favor, the court construes his *Monell* claim as asserting a final policymaker theory, a condonation theory, and a failure to train theory.   *See Lytle*, 326 F.3d at 471, *supra*.

1.   <u>Final Policymaker Theory</u>

"A 'governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances' so long as that governmental unit possessed 'final authority to create official policy.'"   *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554 (4th Cir. 2018) (emphasis in original) (citing *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).   "[In assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action

ordered.'" *Id.* at 554–55 (citing *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). "If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy." *Id.* at 555 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).   "A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lytle*, 326 F.3d at 472.   As with all *Monell* claims, reliance on a final policymaker theory requires identification of the specific policy, attribution of the policy to the municipality, and an affirmative link between the policy and the plaintiff's specific rights violation.  *See Spell*, 824 F.2d at 1389, *supra*.

Here, Plaintiff alleges, *inter alia*, the following:

> 82.  Baltimore County has also empowered its officers, specifically the Individual Defendants and others in special units, including the Criminal Apprehension Support Team to freely violate the constitutionally protected rights of citizens by failing to equip them with body cameras. . . .

> 85.  Despite Baltimore County's stated goal of equipping all officers with body cameras, not a single officer involved in Mr. Radomski's shooting was wearing a camera.

> 86.  In August 2022, Baltimore County Police estimated that 350 sworn officers still lacked body worn cameras.

> 87.  After Defendant Trenary shot another civilian in 2023, again without a body worn camera or dashboard camera on his vehicle, Baltimore County Police estimated that there were still about 350 sworn officers without body worn cameras.

> 88.  At all times, the Chief of Police for Baltimore County, Melissa Hyatt from 2019 to November 2022, had complete discretion over which officers or units were incorporated into the BCPD body worn camera program.

> 89.  Baltimore County, through its Chief of Police, established a policy that certain officers, including the Individual Defendants, would be excluded from the body worn camera program even though they engage in a disproportionate amount of police activity that otherwise requires activation of a body worn camera.

25

90.   By creating a "special unit" like the Criminal Apprehension Support Team, with actual knowledge that these units are more likely to commit serious violations of the constitutional rights of civilians, and reducing officer accountability through an official policy of excluding these officers from the body worn camera program, Baltimore County made it reasonably likely that injuries such as those inflicted upon Mr. Radomski, would occur with regularity.

91.   This intentional failure to ensure even a marginal level of accountability is evidence that Baltimore County intended for special units like the Criminal Apprehension Case Support Team to act with impunity. . . .

97.   As a direct and foreseeable result of the aforementioned policies, Baltimore County Police Officers regularly deprive citizens of their constitutionally protected rights, including to be free from summary punishment and excessive force.

98.   Baltimore County knew, or should have known, that the execution of these customs or policies would cause severe injuries to citizens, including Mr. Radomski.

(ECF No. 1 ¶¶ 82, 85–91, 97–98.)

Through these alleged facts, Plaintiff identifies the policy—the County's body worn camera policy; attributes the policy to a County decisionmaker who exercised the relevant discretion—Chief of Police Melissa Hyatt; and links the policy to the injury Mr. Radomski sustained—reduced accountability of Officer Defendants as Criminal Apprehension Support Team members, allowing them to act with impunity in their use of excessive force.  Drawing all reasonable inferences in his favor, the court finds that Plaintiff plausibly alleges a final policymaker theory claim.  While Plaintiff must ultimately prove that the Chief of Police possesses final policymaking authority as a matter of law,[13] his allegations are sufficient at this stage to state a claim, especially where the County has not offered any argument to challenge Plaintiff's

---

[13] *See Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 555 (4th Cir. 2018) ("The question of who possesses final policymaking authority is one of state law") (quoting *Riddick v. Sch. Bd.*, 238 F.3d 518, 523 (4th Cir. 2000)).

allegations under the theory, *e.g.*, that its Chief of Police is not a final policymaker to provide a basis for municipal liability.   The court therefore finds that Plaintiff plausibly alleges a final policymaker theory as the basis for his *Monell* and *Longtin* claims.

2. Condonation Theory

Under a theory of "custom by condonation," a municipality violates § 1983 if "municipal policy makers fail to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens v. Balt. City State's Attys. Office,* 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1389–90 (4th Cir. 1987)) (citations omitted); *see also Monell*, 436 U.S. at 690–91 (holding that "'[o]fficial policy' is not the only basis for imposing municipal liability. 'Custom, or usage,' in the exact language of § 1983, may also serve.   And the existence of such a 'custom or usage' may be found in 'persistent and widespread . . . practices of [municipal] officials [which] although not authorized by written law, [are] so permanent and well-settled as to [have] the force of law'") (quoting *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167–68 (1970)).   "Under the 'condonation' theory, unlike the 'express policy' theory, a plaintiff need not reference any specific written policy when making their claim—instead, it is sufficient to plead sufficient facts that demonstrate the existence of a widespread pattern or practice."   *Corbitt v. Baltimore City Police Dep't*, No. CV RDB-20-3431, 2022 WL 846209, at *9 (D. Md. Mar. 22, 2022).

To state a *Monell* claim based on a condonation theory, "[a] plaintiff must point to a persistent and widespread practice[] of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference."   *Owens*, 767 F.3d at 402 (citation omitted).   "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only support his condonation claim with facts which, if true, 'state a claim to relief that is plausible on its face.'"   *Jones v.*

*Jordan*, No. CV GLR-16-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017) (quoting *Owens*, 767 F.3d at 403, that "simply alleging" a *Monell* claim is easier than prevailing on the merits). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402–403 (quoting *Spell*, 824 F.2d at 1391).

"Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387). Further, a policy or custom that gives rise to § 1983 liability will not "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). "Only when a municipality's conduct demonstrates a 'deliberate indifference' to the rights of its inhabitants can the conduct be properly thought as a 'policy or custom' actionable under § 1983." *Nicholson v. Baltimore Police Dep't*, No. CV DKC 20-3146, 2021 WL 1541667, at *8 (D. Md. Apr. 20, 2021) (quoting *Wellham*, 104 F.3d at 626). "To plead deliberate indifference, plaintiff need only allege that the municipality was aware of the alleged pattern or practice and 'that the municipality's failure to discipline its officers 'allowed' a custom, policy or practice 'of [constitutional] violations to develop.'" *Corbitt*, 2022 WL 846209, at *9 (quoting *Jordan*, 2017 WL 4122795, at *10).

A plaintiff "must also plausibly allege that the condoned policy or custom has an affirmative causal link to their particular constitutional violation." *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 311 (D. Md. 2020). In *Johnson*, this court explained:

> This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (internal quotations omitted); *see also, e.g., Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

28

As the Fourth Circuit has recognized, however, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish . . . causation." *Jordan by Jordan*, 15 F.3d at 339. Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *accord Jordan by Jordan*, 15 F.3d at 340. Courts in this District have heeded this call, and held that a plaintiff need only allege that the municipality "was aware of ongoing constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g., McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017).

*Id.* at 311. Accordingly, a plaintiff is not required to "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan*, 15 F.3d at 339–40.

In *Corbitt*, this court concluded that the plaintiff plausibly alleged a § 1983 violation under a condonation theory of *Monell* liability where he alleged "several prior incidents, lawsuits, and investigations" that established the defendant police department "had knowledge of [the] misconduct and failed to correct it, and . . . a causal connection between [the] misconduct and his injury." 2022 WL 846209, at *8. Similarly, in *Sulton v. Baltimore County*, this court held that a plaintiff had alleged sufficient prior incidents to "survive the low bar of a motion to dismiss," noting that while the plaintiff had alleged "only one specific prior incident involving the [the police department's] use of force against a mentally ill individual," with officers uninvolved in the litigation before it, the plaintiff's complaint still included "more general allegations that the specified incidents are only 'some of the examples of deadly force' and that 'there have been other

occasions in which members of the [police department] have unreasonably directed deadly force at emotionally disturbed persons.'" *Sulton v. Baltimore County,* Case No. SAG-18-cv-2864, 2021 WL 948820, *6 (D. Md. Mar. 12, 2021)  "Those type of allegations have, in similar contexts, been deemed sufficient to survive the low bar of a motion to dismiss."  *Id.* (citing cases).

Thus, Plaintiff need not plead multiple specific instances where Officer Defendants made similar decisions.  *See Jordan by Jordan*, 15 F.3d at 339, *supra*.  Here, Plaintiff alleges, *inter alia*:

> 78.  Baltimore County has also instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights.
>
> 79.  The use of excessive force occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore County. This is a result of Baltimore County's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that excessive force will not be used and to ensure that allegations of excessive force will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of excessive force, failure to provide adequate medical care, cover-up, and failure to investigate. This pattern and practice has been manifested in other prior incidents involving county officers.   [Describing Examples] . . . .
>
> 80.  Baltimore County has failed to keep accurate records as to the number of false arrests by members of its police force. This policy encourages arrests without probable cause and inhibits Baltimore County from critically evaluating the need for a change in training.
>
> 81.  Baltimore County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of excessive force by officers who have a pattern or history of such behavior.
>
> 82.  Baltimore County has also empowered its officers, specifically the Individual Defendants and others in special units, including the Criminal Apprehension Support Team to freely violate the constitutionally protected rights of citizens by failing to equip them with body cameras. . . .

90.  By creating a "special unit" like the Criminal Apprehension Support Team, with actual knowledge that these units are more likely to commit serious violations of the constitutional rights of civilians, and reducing officer accountability through an official policy of excluding these officers from the body worn camera program, Baltimore County made it reasonably likely that injuries such as those inflicted upon Mr. Radomski, would occur with regularity.

91.  This intentional failure to ensure even a marginal level of accountability is evidence that Baltimore County intended for special units like the Criminal Apprehension Case Support Team to act with impunity. . . .

93.  Baltimore County also fails to act in reporting these incidents of reckless conduct to any supervising authority, and or the citizens of Baltimore County. The County lacks an effective internal affairs procedure and has no meaningful system to control or monitor its officers and employees who have a pattern or history of unlawful behavior. . . .

97.  As a direct and foreseeable result of the aforementioned policies, Baltimore County Police Officers regularly deprive citizens of their constitutionally protected rights, including to be free from summary punishment and excessive force.

(ECF No. 1 ¶¶ 78–82, 91, 93, 97.)  Plaintiff also alleges other instances of excessive force by County law enforcement officers, including punching and shooting people, with at least one allegation of deadly force by an officer effectuating a traffic stop.  *Id.* ¶ 79.  Plaintiff further describes an incident in which Officer Defendant Trenary shot at a driver while attempting to serve a warrant.  (ECF No. 1 ¶ 44.)

Accepting Plaintiff's allegations as true and drawing all reasonable inferences in his favor, Plaintiff alleges a "persistent and widespread practice" of excessive force by County law enforcement officers, including members of the Criminal Apprehension Case Support Team, of which the County had actual knowledge, and that the County, due to its deliberate indifference,

failed to correct.  *See Owens*, 767 F.3d at 402, *supra*.   The court will therefore deny the County's Motion as to Counts III and V based on a theory of condonation.

3.  <u>Failure to Train</u>

"A municipality can also be liable for an established policy through a failure to train, if it reflects a deliberate or conscious choice to not do so." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).   "Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty.'" *Id.* (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir. 1987)).   "A failure to train *Monell* theory requires a plausible demonstration that (1) the nature of the training was insufficient in some particularized manner; (2) the insufficiency of the training was a deliberate or conscious choice; and (3) a causal relationship existed between the failure-to-train and the injuries suffered." *Palma v. Montgomery Cnty.*, 598 F. Supp. 3d 288, 298 (D. Md. 2022).

"As to the first element, 'the plaintiff must point out a specific deficiency in training, rather than general laxness or ineffectiveness in training.'" *Id.* (quoting *Washington v. Baltimore Police Dep't*, 457 F. Supp. 4 520, 533 (D. Md. 2020)); *see Spell*, 824 F.2d at 1390 ("[A] sufficiently close causal link must be shown between potentially inculpating training deficiency or deficiencies and specific violation.  This requires first that a specific deficiency rather than general laxness or ineffectiveness in training be shown.").   Conclusory or broad-sweeping allegations of deficient officer training that was a deliberate or conscious choice by the municipality and resulted in unconstitutional officer conduct are insufficient to state a claim.  *See, e.g.*, *Corbitt v. Baltimore City Police Dep't*, No. CV RDB-20-3431, 2022 WL 846209, at *8 (D. Md. Mar. 22, 2022); *Devi*

*v. Prince George's Cnty.*, No. CV DKC 16-3790, 2017 WL 3592452, at *3 (D. Md. Aug. 21,

2017); *Jones v. Chapman*, No. CIV.A. ELH-14-2627, 2015 WL 4509871, at *18–20 (D. Md. July

24, 2015); *Hall v. Fabrizio*, No. CIV. JKB-12-754, 2012 WL 2905293, at *2 (D. Md. July 13,

2012).

Here, Plaintiff relies on conclusory allegations insufficient to support a claim based on a

failure to train theory:

> 76.   Baltimore County failed to properly train, supervise, and
> discipline its officers against the use of excessive force.
>
> 77.   The failure to properly train, supervise, and discipline officers
> demonstrates gross disregard for the constitutional rights of the
> public, including Mr. Radomski, and was a proximate cause of Mr.
> Radomski's injuries. . . .
>
> 92.   Further, the failure to train Baltimore County Officers in the
> appropriate use of deadly force is so patently obvious from the
> conduct of the Individual Defendant Officers that constitutional
> violations would be the expected result. . . .
>
> 97.   As a direct and foreseeable result of the aforementioned
> policies, Baltimore County Police Officers regularly deprive
> citizens of their constitutionally protected rights, including to be free
> from summary punishment and excessive force.

(ECF No. 1 ¶¶ 76–77, 92, 97.)  While Plaintiff avers that that County failed to properly train its

officers against the use of excessive force and that this failure was a proximate cause of Mr.

Radomski's injuries, *see* ECF No. 1 ¶¶ 75, 77, he alleges no facts about the nature of the training

(even to the extent it is deficient) or how the deficient training reflects the decision of a municipal

policymaker.   Even assuming Plaintiff has alleged facts to support his claim of deliberate

indifference by the County, *see Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of

similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

deliberate indifference for purposes of failure to train."), Plaintiff's failure to allege such facts as

to the nature and deficiency of the training is fatal to his claims under this theory.  The court will therefore grant the County's Motion to the extent Plaintiff's *Monell* and *Longtin* claims are based on a theory of failure to train.

## C. Negligence Claim

Defendants all seek dismissal of Plaintiff's claim of negligence, with the County asserting defenses of both governmental immunity and public official immunity, and the Officer Defendants asserting defenses of public official immunity.  (ECF No. 14-1 at p. 6–7; ECF No. 15-1 at p. 4–5.) Plaintiff did not respond to (and, therefore, concedes) the County's assertion of immunity, but contends that, because a reasonable juror could find that Officer Defendants acted with gross negligence, dismissal of the negligence count against Officer Defendants is "inappropriate." (ECF No. 18 at p. 31.)

### 1. <u>Governmental Immunity</u>

"Under Maryland law, counties enjoy governmental immunity from tort liability with respect to 'nonconstitutional torts based on activity categorized as governmental.'"  *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011) (quoting *Housing Auth. of Balt. City v. Bennett,* 359 Md. 356 (2000)).  The State's right, and by extension, the right of the County, "to governmental immunity is 'deeply ingrained in Maryland law' and may not be waived in the absence of express or implied statutory authorization." *Devi v. Prince George's Cnty.*, No. CV DKC 16-3790, 2017 WL 3592452, at *2 (D. Md. Aug. 21, 2017) (quoting *Nam v. Montgomery Cnty.*, 127 Md. App. 172, 182 (1999)); *see also Boyd v. Armstrong*, No. CV ELH-17-2849, 2019 WL 1440876, at *35 (D. Md. Mar. 29, 2019) ("[A] municipality, such as the County, is also entitled to governmental immunity.").  "A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its

immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity." *DiPino v. Davis*, 354 Md. 18, 47 (1999). "The operation of a police force is a governmental function." *Williams v. Prince George's Cnty., MD*, 157 F. Supp. 2d 596, 604 (D. Md. 2001) (quoting *Hector v. Weglein,* 558 F. Supp. 194, 206 (D. Md. 1982)); *see Schmidt v. Town of Cheverly, MD.*, 212 F. Supp. 3d 573, 583 (D. Md. 2016) (same); *Devi*, 2017 WL 3592452, at *2 (same).

"Maryland law does not waive the counties' governmental immunity from tort liability" under the Maryland Local Government Tort Claims Act ("LGTCA"); rather, the LGTCA "requires each county to provide limited indemnity to county employees for non-malicious tortious acts or omissions committed in the employees' scope of employment." *Paulone*, 787 F. Supp. 2d at 378. Enactment of the LGTCA "sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Mendygral v. Mayor and City Council of Ocean City*, No. CV ELH-21-1381, 2022 WL 125275, at *7 (D. Md. Jan. 13, 2022) (quoting *Rios v. Montgomery Cnty.*, 157 Md. App. 462, 475–76 (2004)).

The LGTCA does not "authorize suit against the local government for its employee's actions." *Holloway-Johnson v. Beall*, 220 Md. App. 195, 207–208 (2014), *aff'd in part, rev'd in part,* 446 Md. 48 (2016); *see Beall v. Holloway-Johnson*, 446 Md. 48, 76–77 (2016) ("[T]he LGTCA does not allow a plaintiff to bring suit directly against the local government."); *Williams v. Maynard*, 359 Md. 379, 394 (2000) ("[T]he LGTCA does not waive governmental immunity or otherwise authorize any actions directly against local governments."); *Nam v. Montgomery Cnty.*, 127 Md. App. 172, 184 (1999) ("Nowhere in the Act, however, is there a waiver of immunity so

that the governmental entity is subject to being made a party to an action based upon its employee's or agent's tortious acts. The governmental entity's liability is analogous to a public liability policy on an automobile. The insurance company is liable for such damages as its assured may inflict, but, generally speaking, the insurance company is not an entity which may be sued for its assured's torts."); *Hicks v. Anne Arundel Cnty.*, No. CV JKB-20-0022, 2020 WL 7624773, at *5 (D. Md. Dec. 22, 2020) ("A Maryland statute provides that local governments may be vicariously liable for the tortious acts or omissions of their employees, but this statute contains no specific waiver of governmental immunity when a governmental entity is sued in its own capacity." (citations omitted)); *Boyd v. Armstrong*, No. CV ELH-17-2849, 2019 WL 1440876, at *35 (D. Md. Mar. 29, 2019) ("[T]he LGTCA does not permit plaintiffs to name the County directly in a common law tort suit.").

Plaintiff does not oppose the County's Motion on the basis of governmental immunity as to his negligence claim. Further, it is undisputed that Plaintiff's negligence claim arises from the governmental function of operation of a police force. *See Williams*, 157 F. Supp. 2d at 604, *supra*. Accordingly, the County is entitled to governmental immunity for Plaintiff's negligence claim. The court will therefore grant the County's Motion as to Count VII.[14]

### 2. Public Official Immunity

Similarly, "Maryland courts have long recognized the common law doctrine of public official immunity." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 297 (D. Md. 2020). The doctrine is "quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee v. Cline*, 384 Md. 245, 258–60 (2004) (citing cases). The Supreme Court of Maryland "has consistently held that Maryland common law

---

[14] The County asserts this same argument for Plaintiff's gross negligence claim; however, Plaintiff does not assert his gross negligence claim against the County. (ECF No. 1 at p. 27.)

qualified immunity in tort suits, for public *officials* performing *discretionary* acts, has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called 'intentional torts.'"  *Id.* at 258 (emphasis in original); *see Cooper v. Rodriguez*, 443 Md. 680, 713 (2015) ("Common law public official immunity applies to public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties." (footnote and citation omitted)).

"[D]iscretion is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience and uncontrolled by the judgment or conscience of others." *Cooper*, 443 Md. at 713 (citation omitted). "[L]aw enforcement 'officers are public officials' for purposes of common law public official immunity." *Id.* at 727 (quoting *Smith v. Danielczyk,* 400 Md. 98, 128 (2007)). Moreover, "when they are within the scope of their law enforcement functions," as is alleged here (ECF No. 1 ¶ 15), "police officers 'are clearly acting in a discretionary capacity." *Robinson v. Bd. of Cnty. Comm'rs for Prince George's Cnty.*, 262 Md. 342, 347 (1971); *see Johnson*, 452 F. Supp. 3d at 298 (same); *Cooper v. Doyle*, No. CV DKC 22-0052, 2022 WL 16923857, at *3 (D. Md. Nov. 14, 2022) (same).

Here, Plaintiff asserts a negligence claim against Officer Defendants (public officials for the purposes of public official immunity) who were acting in a discretionary capacity to fulfill a law enforcement function (service of an arrest warrant) at the time of the incident.  (ECF No. 1 ¶ 15.)  Moreover, Plaintiff's opposition to Officer Defendants' Motion appears to concede that, at all times relevant, Officer Defendants were public officials engaged in a discretionary act.  (ECF No. 18 at p. 31.)  While "gross negligence is an exception to common law public official immunity," mere negligence is not.  *See Cooper*, 443 Md. at 714, and *Lee*, 384 Md. at 258, *supra*.

Because they are entitled to public official immunity, the court will grant Officer Defendants' Motion as to Plaintiff's negligence claim.[15]

IV.   **CONCLUSION**

For the reasons set forth herein, by separate order, the Officer Defendants' Motion, construed as a Rule 12(c) motion for judgment on the pleadings, will be granted as to Count VII, and denied in all other respects; and the County's Motion, construed as a Rule 12(c) motion for judgment on the pleadings, will be granted as to Count VII, granted and as to Counts III and V as to a failure to train theory, and denied in all other respects.  The claims will proceed as follows:

| Counts | Defendants |
|---|---|
| Count I: Common Law Battery | Officer Defendants |
| Count II: 42 U.S.C. § 1983, Excessive Force | Officer Defendants |
| Count III: 42 U.S.C. § 1983, Excessive Force – *Monell* Claim | The County (except as to a failure to train theory) |
| Count IV: Articles 24 and 26 of the Maryland Declaration of Rights, Excessive Force | All Defendants |
| Count V: Articles 24 and 26 of the Maryland Declaration of Rights, Excessive Force – *Longtin* Claim | The County (except as to a failure to train theory) |
| Count VI: Common Law Gross Negligence | Officer Defendants |

August 23, 2024                              /s/_____
                                             Julie R. Rubin
                                             United States District Judge

---

[15] Because the court concludes that the County is entitled to governmental immunity, it does not consider the County's assertion of public official immunity.